# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| AMERICAN ALLIANCE FOR EQUAL RIGHTS, | |
| *Plaintiff,* | |
| v. | Case No. 25-3980 |
| AMERICAN BAR ASSOCIATION, | |
| *Defendant.* | |

## COMPLAINT

1.      If any group should oppose racial discrimination in the legal profession, it's the American Bar Association. Counting nearly a quarter of lawyers as members, the ABA is supposed to broadly represent the interests of the legal profession. And it drafts the model rules of professional conduct, including the one barring lawyers from "discrimination on the basis of race." ABA Model R. of Prof'l Conduct 8.4(g). That rule "embodies" the principle that racial discrimination "'undermines'" the principle that "'all people are created equal,'" "'especially [w]hen the person who engages in this misconduct is an officer of the court.'" ABA Formal Op. 493 (July 15, 2020). As the Chief Judge of the Eleventh Circuit recently stressed, that principle "contains no carveout for 'diversity'" initiatives that "turn on the consideration of impermissible characteristics like … race." *Order re: Judicial Complaint No. 11-25-90043* (Mar. 20, 2025), perma.cc/G5CH-93UN.

2.      But instead of opposing racial discrimination, the ABA practices it. One prominent example is its Legal Opportunity Scholarship Fund. Run by the ABA's "Di-

versity, Equity, and Inclusion Center," this scholarship awards $15,000 to select students who will be starting law school in the fall. Almost any incoming law student can apply—so long as their skin isn't white. Per the ABA, one of the few requirements is:

> 2  The applicant must be a member of an underrepresented racial and/or ethnic minority (e.g. Black/African-American, Native American, Hispanic American, Asian/Pacific Islander). Please note: International students are not eligible.

3.     This blatant discrimination is not only unbecoming of an association of lawyers, but it's also illegal. The scholarship is contractual in nature, so the ABA's racial bar violates 42 U.S.C. §1981.

4.     The American Alliance for Equal Rights has members who are the victims of the ABA's discrimination. The Alliance is entitled to relief.

## PARTIES

5.     The Alliance is a nationwide membership organization that is dedicated to ending all classifications and preferences based on race and ethnicity. The Alliance was founded in 2021. The IRS approved it as a 501(c)(3) that same year.

6.     The Alliance has over 275 members, and its membership continues to grow. The Alliance's members are actively involved in the organization and its affairs. Members voluntarily join. They pay dues. They receive updates. And they offer input on the Alliance's litigation and other activities. The Alliance represents its members in good faith.

7.      The American Bar Association is a professional association of lawyers, law students, and judges. It created, funds, controls, and is otherwise responsible for the challenged scholarship.

## JURISDICTION AND VENUE

8.      This Court has subject-matter jurisdiction under 28 U.S.C. §1331 because this case "arise[s] under" a federal statute.

9.      Venue is proper under 28 U.S.C. §1391 because the ABA is headquartered in Chicago.

## FACTS

### A.      The ABA offers a scholarship for incoming law students—unless they're white.

10.      The ABA runs the "Legal Opportunity Scholarship" for incoming first-year law students. The program is 25 years old.

11.      The scholarship is lucrative and competitive. Winners receive $15,000 over their three years in law school. Only 20-25 students are selected per cycle.

12.      "To be eligible," an applicant "must meet all of the following requirements":

1   The applicant must be an entering, first-year law student in academic year 2025.

2   The applicant must be a member of an underrepresented racial and/or ethnic minority (e.g. Black/African-American, Native American, Hispanic American, Asian/Pacific Islander). Please note: International students are not eligible.

3    Only students beginning law school in this academic year will be eligible for a scholarship. Law students who have completed one or more semesters or years of law school are not eligible.

4    Applicants who are part-time law students also must be starting law school in this academic year to be eligible.

5    At the time of submission of the application, the applicant must have achieved a minimum cumulative grade point average of 2.5 (on a 4.0 grading scale) at their undergraduate institution. If the applicant has not completed their undergraduate degree at the time the application is submitted, the applicant must have a cumulative grade point average of at least 2.5 (on a 4.0 grading scale) as of the most recent completed semester.

6    Before receiving scholarship funds, recipients will be required to demonstrate admission to and plans to enroll at an ABA-accredited law school. Because of the deadline for submitting applications the applicant will have applied to law schools, but may not yet have been admitted to law school. If the applicant is selected to receive an ABA Legal Opportunity Scholarship, the applicant will be required to demonstrate admission to and plans to enroll at an ABA-accredited law school before receiving scholarship funds. Students who do not enroll or who leave law school after being admitted will be required to return all or a proportional amount of scholarship funds.

13.    The scholarship is awarded annually. For the 2025 cycle, the application window opened on February 15 and closes on April 15. "Applications are not accepted outside of the application cycle."

14.    Applicants must apply through a portal, which operates on a different platform separate from the ABA's website. Applicants create an account with a company called Kaleidoscope. Creating an account requires agreeing to Kaleidoscope's Privacy Policy and Terms & Conditions. Both are contracts that require users to give up valuable rights in exchange for using Kaleidoscope's platform.

15.    Applicants to the ABA's scholarship "must submit" a "Personal State-
ment," "Official or unofficial transcript," "2-4 Letters of Recommendation," and a
"Signed Release Form."

(a)    The personal statement is an essay of no more than 1,000 words.
The ABA does not limit what applicants can discuss, but one encouraged topic
is the applicant's "personal and family history of educational or socio-economic
disadvantage."

(b)    The letters of recommendation can be uploaded by the applicant,
or separately by the recommenders. On the FAQs page, the ABA confirms that
applicants can simply reuse "the letters from [their] law school applications." The
ABA does not limit who can be a recommender.

(c)    The release form is a contract between the applicant and the ABA.
It states, "As consideration for such grant and for the opportunity to participate
in the American Bar Association Legal Opportunity Scholarship Program," the
applicant must "grant the ABA the right to use in all media, your name and voice,
and, if selected, your photograph, biography and excerpts from your scholarship
application" in its own materials. The applicant also agrees that the ABA "will
automatically enroll you as a free ABA law student member." Applicants must
sign and date the release form, endorsing the statement: "I hereby consent to the
use of information about myself and my application, as stated and described
herein, and agree with the provisions of this release form."

16. On the application's "Confirmation" page, applicants must sign and date a pledge. That pledge has applicants agree to, among other things, "provide proof" of anything they said on the application, "including a copy of me and my parents' U.S. income tax returns."

17. Winners are chosen by the "ABA LOSF Selection Committee." The committee makes "every effort to go through the review process as quickly as possible." Winners are usually notified in the summer, before law school begins in the fall.

18. White students are not eligible to apply, be selected, or equally compete for the ABA's scholarship.

(a) The scholarship homepage states that "[t]he applicant must be a member of an underrepresented racial and/or ethnic minority (e.g. Black/African-American, Native American, Hispanic American, Asian/Pacific Islander)." That criterion is the second one listed under the header "Requirements for Eligibility," and it appears in a list of six plainly binding requirements, including "grade point average of 2.5." The homepage stresses that, "[t]o be eligible to receive an ABA Legal Opportunity Scholarship, an applicant must meet all of the following requirements," including the racial one.

(b) To remove all doubt, the scholarship's "FAQs" page repeats that applicants "must meet" this same racial "[r]equiremen[t] for [e]ligibility."

(c) The application portal also repeats the same racial requirement under a header titled "Qualifications."

- 6 -

(d)    According to the ABA, "[w]hite lawyers are still overrepresented" today because the percentage of whites "in the legal profession" exceeds the percentage of whites "in the U.S. population."

19.    Even if the scholarship did not flatly exclude whites on its face, the scholarship discriminates against whites in application and by design.

(a)    On the first page of the application, the ABA states that the scholarship's "purpose" is to "encourage students from racial and ethnic minority groups that are traditionally underrepresented in the legal profession to attend law school." And the scholarship furthers this purpose "by providing financial assistance to help *these students* attend law school." (Emphasis added.)

(b)    On the scholarship's homepage, the ABA states that the program's "mission" is to "encourage racial and ethnic minority students to apply to law school and to provide financial assistance *for them* to attend and complete their legal education." (Emphasis added.)

(c)    The ABA created a flyer for the scholarship and asks everyone to "[s]hare" it. The flyer reiterates that the scholarship's "purpose" is to encourage and assist "racially marginalized students." It "was created and is maintained by the Council for Diversity in the Educational Pipeline and The Fund for Justice and Education, which work in tandem to diversify the legal profession."

(d)    The introduction on the scholarship's homepage, as well as the flyer, state that the winners will be "incoming *diverse* law students." (Emphasis

added.) And the ABA tells donors that their "gift" to the scholarship fund "will bring about a more *diverse* … legal profession" and "change the *face* of the legal profession." (Emphases added.) Context, plus myriad statements by the ABA, make clear that "diverse" means "belonging to a particular demographic group, especially a racial minority." The ABA's DEI Plan, for example, defines "diversity" based on "demographic numbers and ensuring historically marginalized populations are adequately represented."

(e)     In a video encouraging donations to the scholarship, the ABA begins by stating, "The legal profession needs to reflect the population that it represents." It then discusses the difference between the percentage of racial minorities in the U.S. population and the percentage of racial minorities in the legal profession; this racial disparity, the video explains, is why the ABA created this scholarship for "law students of color."

20.     The ABA's use of race in scholarships is consistent with its willingness to use race in other areas, for example:

(a)     The ABA is the only recognized accreditor for American law schools. For years, the ABA required law schools to "demonstrate by concrete action" a commitment to diversity, "*particularly racial and ethnic minorities*," by "having a student body that is diverse with respect to gender, race, and ethnicity." Standard 206(a), *ABA Standards and Rules of Procedure for Approval of Law Schools 2024-2025* (emphasis added). The ABA maintained that standard even after the

- 8 -

U.S. Supreme Court—over the ABA's objection—outlawed race-based admissions in 2023. *See* Amicus Br. of ABA, *SFFA v. Harvard*, No. 20-1199 (U.S. Aug. 1, 2022). Only after President Trump was inaugurated in 2025 did the ABA "suspend" this standard (and then only temporarily).

(b)     The ABA opposes what it calls "efforts to expand the *SFFA v. Harvard* decision to justify the elimination of diversity, equity, and inclusion programs in all sectors." It criticizes "race-blindness" as "ignor[ing] historic systemic challenges that have created disparate opportunities for marginalized communities." And it was "deeply troubled" by the Alliance's lawsuits against law firms for their "diversity programs" that excluded certain students based on race. The ABA's president stressed that, even after *Harvard*, the ABA's "dedication to diversity, equity, and inclusion is unyielding" and that the ABA will "lead by example" on this front.

(c)     When the ABA sponsors Continuing Legal Education programs, it requires organizers to "enhance diversity" by preferencing "moderators and faculty members from historically underrepresented communities e.g., racial and ethnic demographic groups/people of color, women, persons with disabilities, and LGBTQ+ individuals."

(d)     The ABA has a Judicial Clerkship Program that once instructed participating judges to "make a commitment to strive to hire at least two minority judicial law clerks." Participating law schools likewise had to "commit to send

(and underwrite the costs for) four to six law students who are from underrepresented communities of color." The ABA later removed this language about explicit race-based quotas after a nonprofit submitted a complaint, though the ABA stressed that the program itself had "not been changed." Still today, the ABA's Business Law Section runs a Diversity Clerkship Program that uses explicit racial preferences. To qualify, law students "must be considered diverse": A "student of color" is automatically considered diverse, while white students are not considered diverse unless they are female, disabled, LGBTQ+, or can prove they overcame "social or economic disadvantages."

## B.   The ABA's discrimination injures the Alliance's members.

21.    The Alliance has members who are harmed by the ABA's discrimination, including Member A.

22.    Member A is a dues-paying member of the Alliance. Lacking the resources and ability to vindicate his own rights, Member A authorized the Alliance to vindicate his rights in this case. The Alliance represents him in good faith.

23.    Member A currently plans to be a full-time, first-year law student in Fall 2025. He has been accepted to—and has submitted a deposit at—an ABA-accredited law school. He is on the waitlist at several other ABA-accredited law schools.

24.    While applying for law school, Member A researched scholarships. But he had trouble finding any that he could apply for, since most were tied to a specific law

school. The ABA's scholarship is not tied to a specific school or focus and would give him an unusually high amount of money.

25.　　Member A has financial need. He estimates being unable to pay at least $20,000 per year to attend and graduate from law school. He would use the ABA scholarship to avoid student loans and focus on his studies rather than work or financial stress.

26.　　Member A satisfies all the scholarship's eligibility requirements, except for the racial one.

　　　　(a)　　He will be an entering, full-time, first-year law student in academic year 2025.

　　　　(b)　　His cumulative undergraduate GPA was well over a 2.5 on a 4.0 scale. It was over a 3.8.

　　　　(c)　　He has already been accepted to an ABA-accredited law school, and has submitted a deposit there, and he could prove those facts to the ABA.

27.　　Member A is not a racial or ethnic minority. He is not one of the listed races or ethnicities, even in part. He is white—which neither the ABA nor any reasonable speaker of English would deem an "underrepresented racial and/or ethnic minority."

28.　　Member A is ready and able to apply to the ABA's scholarship, should a court order the ABA to stop discriminating.

29.    By April 12, 2025, Member A had gathered all the necessary information and materials to apply to the 2025 cycle of the scholarship.

(a)    He created an account on Kaleidoscope, reviewed the ABA's application, and determined how he would answer every question.

(b)    He compiled lists of his academic and non-academic honors and awards, including ten semesters on the Dean's List and three academic awards.

(c)    He compiled his extracurricular activities and employment history, including extensive athletics, coaching, and volunteering.

(d)    He compiled the requested financial, tax, and asset information.

(e)    He drafted a personal statement of more than 700 but less than 1,000 words. His statement explains his background and experiences and how they led him to pursue a career in law.

(f)    He obtained two letters of recommendation to upload himself, one from a college professor and one from a college coach.

(g)    He obtained transcripts from his college. To get them, he had to pay $11.40.

30.    Absent the ABA's racial and ethnic bar, Member A could have and would have submitted a completed application for the 2025 cycle before the April 15 deadline. He would have signed the confirmation and release; and if the application had flagged any information as missing or incorrect, he would have gone back and fixed the issue.

He also would have given the ABA any follow-up information that it requested, including tax returns.

31.     If a court ordered the ABA to stop discriminating, Member A would apply for the next open cycle of the scholarship—whether it be the current cycle, a court-ordered redo of the 2025 cycle, or the next cycle in 2026.

32.     Member A is currently pseudonymous because he fears that the ABA will hold his involvement in this lawsuit against him when selecting winners, or later in his legal career. Member A also fears reprisal from classmates, professors, future employers, the media, judges, and the public for joining the Alliance, for publicly opposing racial preferences, and for helping sue the ABA.

## CLAIM FOR RELIEF

33.     Plaintiff incorporates and restates all its prior allegations.

34.     Section 1981 guarantees "[a]ll persons … the same right … to make and enforce contracts … as is enjoyed by white citizens." 42 U.S.C. §1981(a). It prohibits discrimination by "nongovernmental" actors like the ABA. §1981(c). And it authorizes equitable and legal relief, including damages. *Johnson v. Ry. Express Agency*, 421 U.S. 454, 459-60 (1975).

35.     Member A is protected by §1981, whose "broad terms" bar discrimination "against, or in favor of, any race." *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 295 (1976). Titled "Equal rights under the law," §1981 "guarantee[s] continuous equality between white and nonwhite citizens," *Jam v. Int'l Fin. Corp.*, 586 U.S. 199, 208 (2019),

by protecting the "equal right of all persons … to make and enforce contracts without respect to race," *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 474 (2006) (cleaned up).

36.     Section 1981 "protects 'would-be contractor[s]' … to the same extent that it protects contracting parties." *AAER v. Fearless Fund*, 103 F.4th 765, 776 (11th Cir. 2024). The statute also "offers relief when racial discrimination blocks the creation of a contractual relationship." *Domino's*, 546 U.S. at 475.

37.     A contract under §1981 is "'an agreement to do, or refrain from doing, a particular thing, upon sufficient consideration.'" *Fearless Fund*, 103 F.4th at 775 (quoting 17A Am. Jur. 2d Contracts §1).

38.     The ABA's scholarship involves contracts. For example, applicants must sign a release with the ABA, agreeing to give up their privacy and intellectual-property rights in exchange for a shot at the prize and a free membership. The scholarship is also a "contest" where applicants are chosen based on the quality of their submissions. *Brooklyn Daily Eagle v. Voorhies*, 181 F. 579, 582-83 (C.C.E.D.N.Y. 1910); *accord Haskell v. Time, Inc.*, 857 F. Supp. 1392, 1404-05 (E.D. Cal. 1994) ("answering an essay question" is "a contest"). Contests are classic contracts. *See Personavera, LLC v. Coll. of Healthcare Info. Mgmt. Execs.*, 2021 WL 1313108, at *4 (E.D. Pa. Apr. 8); *Hampton v. Dillard Dep't Stores*, 247 F.3d 1091, 1104 (10th Cir. 2001).

39.     The ABA's scholarship discriminates based on race. "[P]roof of a facially discriminatory" policy—or even "a corporate decision maker's express[ed] desire to

- 14 -

avoid" contracting with members of a "protected group"—is "direct evidence of discriminatory intent." *Amini v. Oberlin Coll.*, 440 F.3d 350, 359 (6th Cir. 2006) (cleaned up). Here, there's both. The contest "facially discriminates" against whites. *Id.* And the ABA's "corporate decision maker[s]" have expressed a "desire to avoid" contracting with whites. *Id.* The Alliance, therefore, "is not required to make any further allegations of discriminatory intent or animus." *Juarez v. Nw. Mut. Life Ins.*, 69 F. Supp. 3d 364, 370 (S.D.N.Y. 2014).

40.     The ABA's discrimination must survive strict scrutiny. "[A]ll racial classifications … must be analyzed by a reviewing court under strict scrutiny." *Adarand Constructors v. Pena*, 515 U.S. 200, 227 (1995); *see Gratz v. Bollinger*, 539 U.S. 244, 276 n.23 (2003) (same for §1981). The ABA "bears the burden." *Fisher v. UT-Austin*, 570 U.S. 297, 310 (2013) (cleaned up).

41.     The ABA has no compelling interest. The ABA has no "specified, identified instances" of recent "past discrimination" that its scholarship is trying to remedy. *Harvard*, 600 U.S. at 207. And its stated interest in "outright racial balancing" is illegitimate. *Id.* at 223 (cleaned up). At the "heart" of "equal protection lies the simple command that" every individual be treated "as individuals, not as simply components of a racial … class." *Id.*

42.     Nor is the ABA's program narrowly tailored. A categorical exclusion of an entire racial group is, by definition, not narrowly tailored. White students' race operates as a negative against them. The ABA's use of race has lasted 25 years and has no

end point. And the ABA ignored workable race-neutral alternatives, like considering need instead of race.

43.     The scholarship also allows "Asian" students to apply, even though—according to the ABA—"Asian Americans are now represented in the legal profession very close to their share of the U.S. population." Asians are *overrepresented*, by the ABA's lights, because they make up "7%" of lawyers but "6.4%" of the general population. The scholarship's arbitrary inclusion of Asians is another reason it cannot satisfy strict scrutiny. *See Richmond v. J.A. Croson Co.*, 488 U.S. 469, 506 (1989).

44.     The scholarship is not tailored to helping students afford to attend or graduate from law school. Its eligibility criteria turn on race, not financial need. In fact, only "39% of Scholarship recipients" are the "first in their family to attend college." And the ABA would not give the scholarship to a white student, no matter how badly that student needed financial assistance. The ABA's scholarship thus rests on racial stereotypes, using whiteness as a proxy for advantage and minority status as a proxy for disadvantage.

## PRAYER FOR RELIEF

45.     This Court should enter judgment in Plaintiff's favor and against Defendant and provide the following relief:

A.     A declaration that the scholarship violates 42 U.S.C. §1981.

B.     A TRO and preliminary injunction barring Defendant from closing the application window or selecting winners for the scholarship.

- 16 -

C.      A permanent injunction barring Defendant from knowing or considering applicants' race or ethnicity when administering the scholarship.

D.      Nominal damages.

E.      Any equitable relief needed to undo Defendant's discrimination, including an order forcing Defendant to reopen the application process, to rerun the application process under neutral criteria, and to waive criteria like requiring applicants to be rising first-years.

F.      Reasonable costs and expenses of this action, including attorneys' fees.

G.      All other relief that the Alliance is entitled to.

Dated: April 12, 2025                          Respectfully submitted,

                                               /s/ Matt Pociask
Adam K. Mortara**                              Thomas R. McCarthy*
   (TN Bar No. 40089)                          Cameron T. Norris*
LAWFAIR LLC                                    Matt Pociask**
40 Burton Hills Blvd., Ste. 200                R. Gabriel Anderson*
Nashville, TN 37215                            CONSOVOY MCCARTHY PLLC
(773) 750-7154                                 1600 Wilson Blvd., Ste. 700
mortara@lawfairllc.com                         Arlington, VA 22209
                                               (703) 243-9423
                                               tom@consovoymccarthy.com
                                               cam@consovoymccarthy.com
                                               matt@consovoymccarthy.com
                                               gabe@consovoymccarthy.com

                                               *pro hac vice forthcoming
                                               **member of N.D. Ill.