## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

AMERICAN ALLIANCE FOR EQUAL RIGHTS,

*Plaintiff*,

v.                                                    Case No. 1:25-cv-3980

AMERICAN BAR ASSOCIATION,

*Defendant*.

## VERIFIED AMENDED COMPLAINT

1.      If any group should oppose racial discrimination, it's the American Bar Association. Counting nearly a quarter of lawyers as members, the ABA is supposed to broadly represent the interests of the legal profession. And it drafts the model rules of professional conduct, including the one barring lawyers from "discrimination on the basis of race." ABA Model R. of Prof'l Conduct 8.4(g). That rule "embodies" a core principle: that racial discrimination "'undermines'" the truth that "'all people are created equal,'" "'especially [w]hen the person who engages in this misconduct is an officer of the court.'" ABA Formal Op. 493 (July 15, 2020). As the Chief Judge of the Eleventh Circuit recently stressed, that principle "contains no carveout for 'diversity'" initiatives that "turn on the consideration of impermissible characteristics like … race." *Order re: Judicial Complaint No. 11-25-90043* (Mar. 20, 2025), perma.cc/G5CH-93UN.

2.      But instead of opposing racial discrimination, the ABA practices it. Its Legal Opportunity Scholarship Fund awards $15,000 to select students who will be starting law school in the fall. Almost any incoming law student can apply—so long as

their skin isn't white. Per the ABA, one of the scholarship's few eligibility requirements is:

> 2 The applicant must be a member of an underrepresented racial and/or ethnic minority (e.g. Black/African-American, Native American, Hispanic American, Asian/Pacific Islander). Please note: International students are not eligible.

3.     This blatant discrimination is not only unbecoming of an association of lawyers, but it's also illegal. The scholarship is contractual in nature, so the ABA's racial bar violates 42 U.S.C. §1981.

4.     The American Alliance for Equal Rights has members who are the victims of the ABA's discrimination. The Alliance is entitled to relief.

## PARTIES

5.     The Alliance is a nationwide membership organization that is dedicated to ending all classifications and preferences based on race and ethnicity. The Alliance was founded in 2021. The IRS approved it as a 501(c)(3) that same year.

6.     The Alliance has nearly 300 members, and its membership continues to grow. The Alliance's members are actively involved in the organization and its affairs. Members voluntarily join. They pay dues. They receive updates. And they offer input on the Alliance's litigation and other activities. The Alliance represents its members in good faith.

7.    The American Bar Association is a professional association of lawyers, law students, and judges. It created, funds, controls, and is otherwise responsible for the challenged scholarship.

## JURISDICTION AND VENUE

8.    This Court has subject-matter jurisdiction under 28 U.S.C. §1331 because this case "arise[s] under" a federal statute.

9.    Venue is proper under 28 U.S.C. §1391 because the ABA is headquartered in Chicago.

## FACTS

### A.    The ABA offers a scholarship for incoming law students—unless they're white.

10.    The ABA runs the "Legal Opportunity Scholarship" for incoming first-year law students. The program is 25 years old. Over 400 winners have been selected.

11.    The scholarship is lucrative and competitive. Winners receive $15,000 over their three years in law school ($5,000 per year). The scholarship is unusually desirable because it is "unrestricted," meaning the money can also be used for "living expenses." *ABA Legal Opportunity Scholarship Fund: Chair Chat*, at 16:52-17:07, ABA Section of Civil Rights and Social Justice, YouTube (Apr. 5, 2023), youtube.com/watch?v=O0PnPo3Q_xU. Only 20-25 students are selected, out of the "hundreds" who apply, each cycle. *Chair Chat* 15:58-16:10.

12.    "To be eligible," an applicant "must meet all of the following requirements":

1  The applicant must be an entering, first-year law student in academic year 2025.

2  The applicant must be a member of an underrepresented racial and/or ethnic minority (e.g. Black/African-American, Native American, Hispanic American, Asian/Pacific Islander). Please note: International students are not eligible.

3  Only students beginning law school in this academic year will be eligible for a scholarship. Law students who have completed one or more semesters or years of law school are not eligible.

4  Applicants who are part-time law students also must be starting law school in this academic year to be eligible.

5  At the time of submission of the application, the applicant must have achieved a minimum cumulative grade point average of 2.5 (on a 4.0 grading scale) at their undergraduate institution. If the applicant has not completed their undergraduate degree at the time the application is submitted, the applicant must have a cumulative grade point average of at least 2.5 (on a 4.0 grading scale) as of the most recent completed semester.

6  Before receiving scholarship funds, recipients will be required to demonstrate admission to and plans to enroll at an ABA-accredited law school. Because of the deadline for submitting applications the applicant will have applied to law schools, but may not yet have been admitted to law school. If the applicant is selected to receive an ABA Legal Opportunity Scholarship, the applicant will be required to demonstrate admission to and plans to enroll at an ABA-accredited law school before receiving scholarship funds. Students who do not enroll or who leave law school after being admitted will be required to return all or a proportional amount of scholarship funds.

*Legal Opportunity Scholarship*, ABA, archive.is/rSTy2 (archived April 13, 2025) (*2025 Homepage*).

13.  The scholarship is awarded annually. For the 2025 cycle, the application window opened on February 15 and closed on April 15. "Applications are not accepted

outside of the application cycle." *Legal Opportunity Scholarship Fund FAQs*, ABA, archive.is/FruH3 (archived Apr. 13, 2025) (*2025 FAQs*).

14.     Applicants must apply through a portal, which operates on a different platform separate from the ABA's website. To access and use the portal, applicants must create an account with a company called Kaleidoscope. Creating an account requires agreeing to Kaleidoscope's privacy policy and terms & conditions. Both are contracts that require users to give up valuable rights in exchange for using Kaleidoscope's platform. *See Privacy Policy*, Kaleidoscope (last updated Mar. 18, 2024), perma.cc/TV2H-UEBJ; *Terms & Conditions*, Kaleidoscope (last updated Oct. 7, 2024), perma.cc/J4VK-DTU9. These agreements require applicants to, for example, let Kaleidoscope own and use their personal data. *See T&C* §6.4; *Privacy Policy*. The ABA benefits from this arrangement, too, because Kaleidoscope agrees to run the ABA's online application portal for the scholarship. *E.g.*, *T&C* §2.1.

15.     Applicants to the ABA's scholarship "must submit" a "Personal Statement," an "Official or unofficial transcript," "2-4 Letters of Recommendation," and a "Signed Release Form." *Legal Opportunity Scholarship Fund Material Requirements*, ABA (Mar. 15, 2023), archive.is/HPxNN (*2025 Material Requirements*).

(a)     The personal statement is an essay of no more than 1,000 words. The ABA does not limit what applicants can discuss, but one encouraged topic is the applicant's "personal and family history of educational or socio-economic disadvantage." *2025 FAQs*. Especially given the minimal and impersonal nature

of the scholarship's other requirements, the personal statement plays an outsized role in determining who wins. *See, e.g.*, *ABA Legal Opportunity Scholarship Recipient Stories 2022*, ABASectionofTaxation, YouTube (Oct. 11, 2022), youtube.com/watch?v=I929eergRPk (explaining that applicant was selected due to "story" in her personal statement).

(b)     The letters of recommendation can be uploaded by the applicant, or separately by the recommenders. On the FAQs page, the ABA confirms that applicants can simply reuse "the letters from [their] law school applications." *2025 FAQs*. The ABA does not limit who can be a recommender.

(c)     The release form is a contract between the applicant and the ABA. It states, "As consideration for such grant and for the opportunity to participate in the American Bar Association Legal Opportunity Scholarship Program," the applicant must "grant the ABA the right to use in all media, your name and voice, and, if selected, your photograph, biography and excerpts from your scholarship application" in its own materials. *Legal Opportunity Scholarship 2025*, Kaleidoscope (*2025 Application*). Applicants must sign and date the release form, endorsing the statement: "I hereby consent to the use of information about myself and my application, as stated and described herein, and agree with the provisions of this release form." *2025 Application*. The applicant also agrees that the ABA "will automatically enroll you as a free ABA law student member." *2025 Application*.

16.     This "consideration" is valuable to the ABA. *2025 Application*. The ABA uses applicants' information to recruit new and additional sources of funding for itself. And when applicants become members, they agree to the ABA's constitution, bylaws, and privacy policy. Those contracts, among other things, let the ABA sell members' data to third parties. *Privacy Policy*, ABA (eff. Apr. 15, 2025). And the ABA uses members' information, including law students with free accounts, to generate advertising revenue for itself and to sell them its products and services—like premium memberships, practice groups, CLEs, and other materials, events, and more. Growing the size of the ABA's membership also increases its audience and its effectiveness when lobbying and litigating.

17.     On the application's "Confirmation" page, applicants must sign and date a pledge. That pledge has applicants agree not to provide "false, misleading or incomplete information" regarding the scholarship and to "provide proof" of anything they said on the application, "including a copy of me and my parents' U.S. income tax returns." *2025 Application*.

18.     Winners are chosen by the "ABA LOSF Selection Committee." *2025 FAQs*. The committee makes "every effort to go through the review process as quickly as possible." *2025 FAQs*. Winners are usually notified in the summer, before law school begins in the fall.

19.     White students are not eligible for the ABA's scholarship. They cannot apply, be selected, or equally compete for the prize.

(a)     The scholarship homepage states that "[t]he applicant must be a member of an underrepresented racial and/or ethnic minority (e.g. Black/African-American, Native American, Hispanic American, Asian/Pacific Islander)." *2025 Homepage.* That criterion is the second one listed under the header "Requirements for Eligibility," and it appears in a list of six plainly binding requirements, including "grade point average of 2.5." *2025 Homepage.* The homepage stresses that, "[t]o be eligible to receive an ABA Legal Opportunity Scholarship, an applicant must meet all of the following requirements," including the racial one. *2025 Homepage.*

(b)     To remove all doubt, the scholarship's "FAQs" page repeats that applicants "must meet" this same racial "[r]equiremen[t] for [e]ligibility." *2025 FAQs.*

(c)     The application portal also repeats the same racial requirement under a header titled "Qualifications." *Legal Opportunity Scholarship 2025*, Kaleidoscope, perma.cc/Z8CM-GG7B (archived June 23, 2025).

(d)     The ABA has conceded in this lawsuit that applicants "must be a member of an underrepresented racial and/or ethnic minority." Doc.17-1 at 3. "White lawyers are still overrepresented," according to the ABA, because the percentage of whites "in the legal profession" exceeds the percentage of whites "in the U.S. population." *Demographics*, *Profile of the Legal Profession 2024*, ABA,

americanbar.org/news/profile-legal-profession/demographics (last visited Apr. 10, 2025).

20.    Even if the scholarship did not flatly exclude whites on its face, the scholarship discriminates against whites in application and by design.

21.    The ABA says the scholarship's purpose is to "change the face of the legal profession." *ABA Legal Opportunity Scholarship Fund*, ABA, americanbar.org/groups/departments_offices/FJE/aba-legal-opportunity-scholarship (last visited June 23, 2025). But the scholarship pursues that purpose only by making money available to racial minorities and unavailable to whites. The scholarship pursues its "purpose" of "encourag[ing] students from racial and ethnic minority groups … to attend law school," according to the ABA, "by providing financial assistance to help these students." *2025 Application*.

22.    The ABA does not bar or limit lawyers who oppose DEI, or white lawyers, from joining the ABA. And when administering the scholarship, the ABA never asks whether applicants share the ABA's goals, let alone requires applicants to demonstrate a commitment to the ABA's goals; to diversity, equity, or inclusion; or to any other mission. So a white applicant who has made groundbreaking contributions to DEI, or who will spend her career advancing DEI, is categorically barred from getting the scholarship. Yet a nonwhite applicant who opposes DEI, or who plans to spend his career challenging DEI, can receive the scholarship.

23.     The ABA does not sincerely believe that the refusal to contract with individuals of one race expresses a message.

(a)     The ABA rejected that view in amicus briefs to the U.S. Supreme Court many times, after it created and while it was operating the scholarship. In *Masterpiece Cakeshop*, for example, the ABA wrote: "As the country's leading association of legal professionals, the ABA is acutely aware that lawyers historically argued that their 'constitutional rights of expression and association' provided legal shelter from antidiscrimination laws. But [the Supreme] Court has long held that such claims are not entitled to 'affirmative constitutional protection.'" Amicus Br. of the Am. Bar Ass'n at 1, *Masterpiece Cakeshop v. Colo. Civil Rights Comm'n*, No. 16-111 (U.S. Oct. 30, 2017) (quoting *Hishon v. King & Spalding*, 467 U.S. 69, 78 (1984)). The positions taken by the ABA in amicus briefs must be "consistent with a previously-adopted ABA policy" or are "adopt[ed] as an ABA policy." *About the Committee: Amicus Curiae*, ABA, americanbar.org/groups/litigation/about/committees/amicus-curiae-briefs/about (last visited June 23, 2025).

(b)     The ABA also enacted Model Rule 8.4(g), which bans conduct that a lawyer "knows or reasonably should know" is "discrimination on the basis of race" in "conduct related to the practice of law." Conduct "related to the practice of law" is defined broadly enough to include an association of lawyers awarding scholarships to law students for law school. *See* Model R. Prof'l Conduct 8.4, cmt. 4 (includes "bar association, business or social activities in connection with

the practice of law"); ABA Formal Op. 493, at 13 (includes comments made to law students). Though the ABA says certain "diversity" initiatives do not violate Rule 8.4(g), the ABA does not mean initiatives that violate antidiscrimination statutes. *See* Model R. Prof'l Conduct 8.4, cmts. 3-5; ABA-*Masterpiece*-Br.34 ("Courts should not be in the business of crafting exemptions to antidiscrimination laws based on their view of the reasonableness or decency of the beliefs at issue."). The ABA contends that Rule 8.4(g) does not implicate the First Amendment when States adopt it or similar bans on discrimination. Such rules are "of a piece with many garden-variety laws and rules prohibiting discriminatory … actions … that are commonly upheld." Amicus Br. of Am. Bar Ass'n 4, *Greenberg v. Lehocky*, Doc.30, No. 22-1733 (3d Cir. Sept. 13, 2022). Per the ABA, "There is no constitutional right to engage in discrimination … in the practice of law (or elsewhere)" because "discrimination" is "conduct," not protected expression. ABA-*Greenberg*-Br.5; *accord id.* at 20-21.

(c)     The ABA has repeatedly denied—at least when threatened with legal action—that the explicit use of race is part of its DEI goals. To gain accreditation, the ABA long required law schools to "demonstrate by concrete action a commitment to diversity and inclusion." Standard 206(a), *ABA Standards and Rules of Procedure for Approval of Law Schools 2024-2025* (emphasis added). After the Supreme Court's decision in *Harvard*, the ABA suspended this standard and proposed changes; its proposed changes stress that a commitment to diversity and

- 11 -

inclusion "does not require a law school to take race … into account in making an individual admissions decision." *Recommended Revisions for Final Approval*, ABA Standards Comm. (Feb. 13, 2025). The ABA could make that change, it reasoned, without "abandoning the value of diversity and inclusion." *Recommendation for Approval for Notice and Comment: Standard 206*, ABA Standards Comm. (Nov. 1, 2024). Similarly, the ABA runs a judicial clerkship program that once instructed judges to "strive to hire at least two minority judicial law clerks" and that instructed schools to "send (and underwrite the costs for) four to six law students who are from underrepresented communities of color." Weiss, *ABA Change Description of Judicial Clerkship Program after Conservative Group Sees 'Quotas'*, ABA J. (Oct. 9, 2024). When a nonprofit complained, the ABA called this language imposing racial quotas "inaccurate" and removed it. *Id.* The ABA insisted that, without these explicit racial requirements, the program is "not … changed" and "remain[s] committed to the ABA's Goal III of enhancing diversity and eliminating bias." *Id.*

(d)     The ABA's board of governors passed a resolution in April 3, 2025, stating that the ABA will "review" certain DEI programs. *Resolution re: ABA Goal III Policies and Programs*, ABA Bd. of Gov'rs (Apr. 3, 2025). The resolution denies that the ABA's DEI programs need to "base eligibility for participation on particular group identities." *Id.* Eliminating racial eligibility requirements does "'not retreat'" from the ABA's objectives, but rather "expands access," "will help build

better understanding," creates a "more sustainable" community, and "would en-
hance" the ABA's programs and goals. *Id.* Yet despite this April 3 resolution, the
ABA has made no changes to the scholarship—including for the 2025 cycle,
which was still open when the resolution passed.

24.     In mid-June 2025, the ABA announced the requirements for the scholar-
ship's next cycle in 2026, stressing that the 2026 cycle "will start soon." *Legal Opportunity
Scholarship Fund FAQs*, ABA, archive.is/4Kpya (archived June 17, 2025) (*2026 FAQs*).
The "[r]equirements for [e]ligibility" in 2026 are unchanged from 2025, including the
requirement that "[t]he applicant must be a member of an underrepresented racial
and/or ethnic minority (e.g. Black/African-American, Native American, Hispanic
American, Asian/Pacific Islander)." *2026 FAQs.* That requirement for the "2026" cycle
appears on the scholarship's homepage and on the FAQs page—both updated in mid-
June 2025. *Legal Opportunity Scholarship*, ABA, archive.is/9NVfN (archived June 23,
2025) (*2026 Homepage*); *2026 FAQs.* The application process for 2026, including the
required materials and the portal run by Kaleidoscope, also remains unchanged from
2025. *See 2026 Homepage* (linking to Kaleidoscope's portal); *Legal Opportunity Scholarship
Fund Material Requirements*, ABA, archive.is/oj8a2 (archived June 17, 2025).

## B.    The ABA's discrimination injures the Alliance's members.

25.     The Alliance has members who are harmed by the ABA's discrimination,
including Members A and B.

- 13 -

26.     Members A and B are dues-paying members of the Alliance. Lacking the resources and ability to vindicate their own rights, Members A and B authorized the Alliance to vindicate their rights in this case. The Alliance represents them in good faith.

27.     Though Members A and B support the Alliance's mission and oppose racial discrimination, they did not authorize the Alliance to represent them in this suit for mere ideological or policy reasons. They sincerely want to apply for and win the ABA's $15,000 scholarship.

28.     **Alliance Member A**. Member A currently plans to be a full-time, first-year law student in Fall 2025. He has been accepted to—and has submitted a deposit at—an ABA-accredited law school. He was on the waitlist at several other ABA-accredited law schools in April 2025 but has since withdrawn and will be attending the school where he submitted a deposit. He just signed a lease for an apartment near the school.

29.     While applying for law school, Member A sought scholarships from all the schools he applied to and received at least five. He also researched other scholarships. But he had trouble finding any that he could apply for, beyond those tied to a specific law school. The ABA's scholarship is not tied to a specific school or practice area and would give him an unusually high amount of money.

30.     Member A has financial need. He estimates being unable to pay at least $20,000 per year to attend and graduate from law school. He would use the ABA scholarship to avoid student loans, help cover living expenses, and focus on his studies rather than work or financial stress.

31.     Member A satisfies all the scholarship's eligibility requirements, except for the racial one.

(a)     He will be an entering, full-time, first-year law student in academic year 2025.

(b)     His cumulative undergraduate GPA was well over a 2.5 on a 4.0 scale. It was over a 3.8.

(c)     He has already been accepted to an ABA-accredited law school, and has submitted a deposit there, and he could prove those facts to the ABA.

32.     Member A is not a racial or ethnic minority. He is not one of the listed races or ethnicities, even in part. He is white—which neither the ABA nor any reasonable speaker of English would deem an "underrepresented racial and/or ethnic minority." So the ABA's scholarship categorically barred him from applying, competing, or winning in 2025—and still bars him today.

33.     Member A is ready and able to apply to the ABA's scholarship, should a court order the ABA to stop discriminating.

34.     Member A spent four to five hours in April 2025 working specifically on his application for the ABA's scholarship—work that he had not done previously. By April 12, Member A had gathered all the necessary information and materials to apply to the 2025 cycle.

(a)   He created an account on Kaleidoscope, visited the application portal and reviewed the scholarship's application, and recorded how he would answer every question.

(b)   He compiled lists of his academic and non-academic honors and awards, including ten semesters on the Dean's List and three academic awards.

(c)   He compiled his extracurricular activities and employment history, including extensive athletics, coaching, and volunteering.

(d)   He compiled the requested financial, tax, and asset information, including by listing the five law-school scholarships that he had been awarded to date.

(e)   He drafted and reviewed a personal statement of more than 700 but less than 1,000 words. His 726-word statement explains his background and experiences and how they led him to pursue a career in law.

(f)   He obtained two letters of recommendation to upload himself, one from a college professor and one from a college coach.

(g)   He obtained transcripts from his college. He didn't have these transcripts already, so he had to order new ones specifically to prepare an application for the ABA's scholarship. To get these new transcripts, he had to pay $11.40.

35.   Absent the ABA's racial and ethnic bar, Member A could have and would have submitted a completed application for the 2025 cycle before the April 15 deadline. He had finished the application and gathered all the necessary materials. He would have

signed the confirmation and release; and if the application had flagged any information as missing or incorrect, he would have gone back and fixed the issue. He also would have given the ABA any follow-up information that it requested, including tax returns.

36.     But on April 15, the ABA closed the application window for the scholarship's 2025 cycle. The ABA knew when it closed the window that this lawsuit had been filed: It responded to press inquiries on April 14, and its outside counsel contacted the Alliance's counsel the morning of April 15. Yet the ABA refused to change the scholarship's criteria, and it denied (through counsel) the Alliance's request to keep the application window open. The ABA maintained the scholarship's racial eligibility requirement throughout the entire 2025 cycle.

37.     If a court ordered the ABA to stop discriminating, Member A would apply for the next open cycle of the scholarship—whether it be the current cycle, a court-ordered redo of the 2025 cycle, or the next cycle in 2026. He still has his answers to all the application's questions and access to all the necessary materials.

38.     **Alliance Member B**. Member B is a full-time employee for a nonprofit, where he works as a research fellow on legal issues.

39.     Based in part on that work experience, Member B will attend law school. He will apply to ABA-accredited law schools in the fall of 2025. And once accepted, he will start his first year of law school in the fall of 2026.

40.     In preparing to apply for law school, Member B is making plans to pay for it. Neither he nor his parents have money set aside for law school. He will have to

pay his own way through a combination of scholarships and loans. He will apply broadly for scholarships.

41.     The ABA's Legal Opportunity Scholarship is particularly attractive to Member B because the amount is unusually high and unrestricted, the scholarship does not require him to attend a particular school or be interested in a particular specialty, and the application process is relatively simple. He can use many of the same materials that he's assembling anyway for his law-school applications.

42.     But Member B is white. He is not Black/African-American, Native American, Hispanic American, Asian/Pacific Islander, or any other racial or ethnic minority—not even in part. His parents aren't either. Nor does he belong to any other demographic group that could be considered "underrepresented" in law.

43.     Member B is ready and able to apply to the ABA's scholarship in the next cycle, should a court order the ABA to stop discriminating. According to the ABA, that next "application cycle for 2026 will open on February 15th and close on April 15th." *2026 FAQs.*

44.     Other than race, Member B will satisfy all the scholarship's eligibility requirements. He will be an entering, full-time, first-year law student in academic year 2026. And when he graduated college in 2021, his cumulative undergraduate GPA was over a 3.6, far higher than a 2.5 on a 4.0 scale.

45. If a court orders the ABA to stop discriminating, Member B will apply for the next open cycle of the scholarship—whether it be for the 2026 cycle, a court-ordered redo of that cycle, or the next cycle in 2027 or 2028. He will gather all required materials, fill out all required applications, sign all required certifications, and provide any required follow-up.

46. If Member B won the ABA's scholarship, he would use the $15,000 to cover his educational expenses. That money would allow him to reduce his debt load. And it would give him more freedom when choosing among law schools.

47. Even if the ABA voluntarily removed the requirement that applicants be racial or ethnic minorities, only a court order would prevent the ABA from considering race and ethnicity and giving preferences to minorities when selecting winners. The ABA advertised the scholarship's racial bar for many years, created the scholarship for racial minorities, and has a history of practicing and defending racial preferences. Especially given its history, the ABA would still impermissibly consider race under a subjective standard like whether applicants have a demonstrated commitment to DEI.

48. The Alliance is currently referring to Members A and B with pseudonyms (and withholding certain details about them and their applications that could identify them) because its members fear that the ABA will hold their involvement in this lawsuit against them when selecting winners, or later in their legal careers. Members A and B also fear reprisal from classmates, professors, future employers, the media, judges, and

the public for joining the Alliance, for publicly opposing racial preferences, and for helping sue the ABA.

49. The ABA understands the importance of associational privacy, as it's currently suing on behalf of pseudonymous members. Even though its members are established partners at large law firms, the ABA's complaint refers to them only as "ABA Member A," "ABA Member B," and so on. *Am. Bar Ass'n v. Trump*, Doc.1 ¶¶185-200, No. 1:25-cv-1888 (D.D.C. June 16, 2025).

## CLAIM FOR RELIEF

50. Plaintiff incorporates and restates all its prior allegations.

51. Section 1981 guarantees "[a]ll persons … the same right … to make and enforce contracts … as is enjoyed by white citizens." 42 U.S.C. §1981(a). It prohibits discrimination by "nongovernmental" actors like the ABA. §1981(c). And it authorizes equitable and legal relief, including damages. *Johnson v. Ry. Express Agency*, 421 U.S. 454, 459-60 (1975).

52. Members A and B are protected by §1981, whose "broad terms" bar discrimination "against, or in favor of, any race." *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 295 (1976). Titled "Equal rights under the law," §1981 "guarantee[s] continuous equality between white and nonwhite citizens," *Jam v. Int'l Fin. Corp.*, 586 U.S. 199, 208 (2019), by protecting the "equal right of all persons … to make and enforce contracts without respect to race," *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 474 (2006) (cleaned up).

53.     Section 1981 "protects 'would-be contractor[s]' … to the same extent that it protects contracting parties." *AAER v. Fearless Fund*, 103 F.4th 765, 776 (11th Cir. 2024). The statute also "offers relief when racial discrimination blocks the creation of a contractual relationship." *Domino's*, 546 U.S. at 475.

54.     A contract under §1981 includes "'an agreement to do, or refrain from doing, a particular thing, upon sufficient consideration.'" *Fearless Fund*, 103 F.4th at 775 (quoting 17A Am. Jur. 2d Contracts §1).

55.     The ABA's scholarship involves contracts. For example, applicants must sign a release with the ABA, agreeing to give up their privacy and intellectual-property rights in exchange for a shot at the prize and a free membership. The scholarship is also a "contest" where applicants are chosen based on the quality of their submissions. *Brooklyn Daily Eagle v. Voorhies*, 181 F. 579, 582-83 (C.C.E.D.N.Y. 1910); *accord Haskell v. Time, Inc.*, 857 F. Supp. 1392, 1404-05 (E.D. Cal. 1994) ("answering an essay question" is "a contest"). Contests are classic contracts. *See Personavera, LLC v. Coll. of Healthcare Info. Mgmt. Execs.*, 2021 WL 1313108, at *4 (E.D. Pa. Apr. 8); *Hampton v. Dillard Dep't Stores*, 247 F.3d 1091, 1104 (10th Cir. 2001).

56.     The ABA's scholarship discriminates based on race. "[P]roof of a facially discriminatory" policy—or even "a corporate decision maker's express[ed] desire to avoid" contracting with members of a "protected group"—is "direct evidence of discriminatory intent." *Amini v. Oberlin Coll.*, 440 F.3d 350, 359 (6th Cir. 2006) (cleaned up). Here, there's both. The contest "facially discriminates" against whites. *Id.* And the

ABA's "corporate decision maker[s]" have expressed a "desire to avoid" contracting with whites. *Id.* The Alliance, therefore, "is not required to make any further allegations of discriminatory intent or animus." *Juarez v. Nw. Mut. Life Ins.*, 69 F. Supp. 3d 364, 370 (S.D.N.Y. 2014).

57.    The ABA's discrimination must survive strict scrutiny. "[A]ll racial classifications … must be analyzed by a reviewing court under strict scrutiny." *Adarand Constructors v. Peña*, 515 U.S. 200, 227 (1995); *see Gratz v. Bollinger*, 539 U.S. 244, 276 n.23 (2003) (same for §1981). The ABA "bears the burden." *Fisher v. UT-Austin*, 570 U.S. 297, 310 (2013) (cleaned up).

58.    The ABA has no compelling interest. The ABA has no "specified, identified instances" of recent "past discrimination" that its scholarship is trying to remedy. *Harvard*, 600 U.S. at 207. And its stated interest in "outright racial balancing" is illegitimate. *Id.* at 223 (cleaned up). At the "heart" of "equal protection lies the simple command that" every individual be treated "as individuals, not as simply components of a racial … class." *Id.* Per the ABA, "Equal dignity necessarily encompasses a right to participate on full and equal terms in day-to-day commercial and social activities without fearing exclusion and stigma based on one's identity." ABA-*Masterpiece*-Br.3.

59.    Nor is the ABA's program narrowly tailored. A categorical exclusion of an entire racial group is, by definition, not narrowly tailored. White students' race operates as a negative against them. The ABA's use of race has lasted 25 years and has no

end point. And the ABA ignored workable race-neutral alternatives, like considering need instead of race.

60.     The scholarship also allows "Asian" students to apply, even though—according to the ABA—"Asian Americans are now represented in the legal profession very close to their share of the U.S. population." Asians are *overrepresented*, by the ABA's lights, because they make up "7%" of lawyers but "6.4%" of the general population. The scholarship's arbitrary inclusion of Asians is another reason it cannot satisfy strict scrutiny. *See Richmond v. J.A. Croson Co.*, 488 U.S. 469, 506 (1989).

61.     The scholarship is not tailored to helping students afford to attend or graduate from law school. Its eligibility criteria turn on race, not financial need. In fact, only "39% of Scholarship recipients" are the "first in their family to attend college." And the ABA would not give the scholarship to a white student, no matter how badly that student needed financial assistance. The ABA's scholarship thus rests on racial stereotypes, using whiteness as a proxy for advantage and minority status as a proxy for disadvantage.

62.     Section 1981 separately bars retaliation. *CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 457 (2008). A defendant cannot take an adverse action against someone because he previously alleged a violation of §1981. *See Pantoja v. Am. NTN Bearing Mfg. Corp.*, 495 F.3d 840, 848-50 (7th Cir. 2007).

# PRAYER FOR RELIEF

63.     This Court should enter judgment in Plaintiff's favor and against Defend-

ant and provide the following relief:

A.     A declaration that the scholarship violates 42 U.S.C. §1981.

B.     A TRO and preliminary injunction barring Defendant from closing the
application window or selecting winners for the scholarship.

C.     A permanent injunction barring Defendant from knowing or in any way
considering applicants' race or ethnicity when administering the scholar-
ship.

D.     Nominal damages.

E.     Any equitable relief needed to undo Defendant's discrimination or retali-
ation, including an order forcing Defendant to reopen the application pro-
cess, to rerun the application process under neutral criteria, and to waive
criteria like requiring applicants to be rising first-years.

F.     Reasonable costs and expenses of this action, including attorneys' fees.

G.     All other relief that the Alliance is entitled to.

Dated: April 12, 2025
Amended: June 25, 2025


Adam K. Mortara**
  (TN Bar No. 40089)
LAWFAIR LLC
40 Burton Hills Blvd., Ste. 200
Nashville, TN 37215
(773) 750-7154
mortara@lawfairllc.com

Respectfully submitted,

*/s/ Cameron T. Norris*
Thomas R. McCarthy*
Cameron T. Norris***
Matt Pociask**
R. Gabriel Anderson*
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
tom@consovoymccarthy.com
cam@consovoymccarthy.com
matt@consovoymccarthy.com
gabe@consovoymccarthy.com

*pro hac vice
**member of N.D. Ill.
***N.D. Ill. membership pending

# VERIFICATION

I, Edward Blum, declare as follows:

1. I am the President of the American Alliance for Equal Rights, the plaintiff here.

2. I have reviewed the allegations in this amended complaint. I believe them all to be true based on my personal knowledge; my review of the cited laws, policies, and documents; and the Alliance's conversations with its members, including Members A and B.

3. I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 25, 2025

Edward Blum
President of American Alliance
for Equal Rights