IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| AMERICAN ALLIANCE FOR EQUAL RIGHTS, | ) ) ) |
| Plaintiff, | ) ) Case No. 25-CV-3980 |
| v. | ) ) Honorable Joan B. Gottschall |
| AMERICAN BAR ASSOCIATION, | ) ) ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Each year, the American Bar Association awards $15,000 Legal Opportunity Scholarship Fund ["LOSF"] scholarships to incoming first-year law students selected through a competitive application process. *See* Verified Am. Compl. ¶ 2, Dkt. No. 19 [hereinafter "Am. Compl."]. In this lawsuit, The American Alliance for Equal Rights ["The Alliance"] contends that the LOSF scholarship program violates the Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981, because in 2025, non-minority, white applicants were ineligible to apply. The case comes before the court on the ABA's motion to dismiss The Alliance's amended complaint for lack of Article III standing and failure to state a claim. Mot. to Dismiss, Dkt. No. 24.

Section 1981(a) guarantees equal treatment in the "mak[ing] and enforce[ment] [of] contracts" as between white and non-white persons. On the merits, the ABA invokes the First Amendment and argues separately that the LOSF scholarship program is not contractual but instead is a discretionary gift to which 42 U.S.C. § 1981 does not apply. But the amended complaint plausibly alleges that the ABA requires scholarship applicants to sign a release granting the ABA, among other things, the right to use a winner's application materials for promotional purposes. *See* Am. Compl. ¶ 15(c). Since that is effectively a license to use

1

copyrighted application materials, and a license constitutes valuable consideration sufficient to form a contract, the court concludes that the amended complaint pleads a plausible 42 U.S.C § 1981 claim. The court does not reach the ABA's First Amendment affirmative defense because, as The Alliance argues, it would be premature to do so without factual development through discovery.

## I. Background

This is a dispute between private parties. Founded in 2021, The Alliance has more than 300 members. Am. Compl. ¶¶ 5–6. It describes itself as "a nationwide membership organization that is dedicated to ending all classifications and preferences based on race and ethnicity." Am. Compl. ¶ 5. According to the amended complaint, the ABA, also a membership organization, "is a professional association of lawyers, law students, and judges." Am. Compl. ¶ 7.

### A. The 2025 Scholarship Program

The ABA has been awarding LOSF scholarships since 2000. *See* Am. Compl. ¶¶ 10, 13. The $15,000 is paid in three $5,000 installments over a winner's three years of law school. Am. Compl. ¶ 11. Scholarship funds are "unrestricted," meaning that students may use them to cover living expenses. Am. Compl. ¶ 11.

The first day to submit applications for a 2025 LOSF scholarship was February 15, 2025. Am. Compl. ¶ 13. Applications closed on April 15. Am. Compl. ¶ 13. The Alliance filed its complaint in this case three days before the deadline, on April 12. Dkt. No. 1.

The Alliance pleads: "White students are not eligible for the ABA's scholarship. They cannot apply, be selected, or equally compete for the prize." Am. Compl. ¶ 19. It points to language on the scholarship's home page stating that "the applicant must be a member of an underrepresented racial and/or ethnic minority (*e.g.*[,] Black/African-American, Native

2

American, Hispanic American, Asian/Pacific Islander)." Am. Compl. ¶ 19; *see also* Am. Compl. ¶ 19(b)–(c) (quoting consistent language on the scholarship's "Frequently Asked Questions" web page and on the application "portal" website). Applicants must also have a 2.5 undergraduate grade point average and be admitted to, and plan to attend, an ABA-accredited law school. *See* Am. Compl. ¶ 12.

For the 2025 cycle, students submitted applications via a "portal" website operated by a non-party company referred to as Kaleidoscope. *See* Am. Compl. ¶ 14. Applicants had to agree to Kaleidoscope's terms and conditions to create a portal account; the terms included giving certain rights to their personally identifiable information. *See* Am. Compl. ¶ 14.

Complete application packages were to consist of the student's transcript(s), letters of recommendation, a release form, and the student's personal statement in the form of an essay of no more than 1,000 words. *See* Am. Compl. ¶ 15. The Alliance alleges that the personal statement, the contents of which the ABA does not prescribe, "plays an outsized role in determining who wins" a scholarship. Am. Compl. ¶ 15. The release form states that it creates a contract between the applicant and the ABA. *See* Am. Compl. ¶ 15(c). The Alliance quotes the following language from the release form: "'As consideration for such grant and for the opportunity to participate in the American Bar Association Legal Opportunity Scholarship Program,' the applicant must 'grant the ABA the right to use in all media, your name and voice, and, if selected, your photograph, biography and excerpts from your scholarship application'" in its own materials. Am. Compl. ¶ 15(c) (quoting *ABA Legal Opportunity Scholarship*, Kaleidoscope 2025 Application); *see also* Am. Compl. ¶¶ 16–17.

## B. Members A and B

The Alliance alleges that at least two of its white, non-minority members, identified in

the amended complaint as Members A and B, have been harmed by the ABA's administration of the scholarship program. *See* Am. Compl. ¶¶ 25–47. As of the filing of the amended complaint, Member A had been accepted to at least one ABA-accredited law school and was scheduled to matriculate in Fall 2025. *See* Am. Compl. ¶ 31. He allegedly met all LOSF scholarship eligibility criteria, except that he is not a member of a racial or ethnic minority group. *See* Am. Compl. ¶¶ 31–32, 35. By April 12, 2025, three days before applications closed, he had gathered all required application materials, recorded his answers to scholarship questions, and stood ready to apply for the scholarship. *See* Am. Compl. ¶¶ 33–34. Member A alleges that he would apply in a future cycle should the court rule favorably to The Alliance. *See* Am. Compl. ¶ 37.

Member B works for The Alliance as a "research fellow on legal issues." Am. Compl. ¶ 38. He did not apply or attempt to apply during the 2025 scholarship cycle. According to the amended complaint, Member B intends to apply to begin attending law school in Fall 2026. *See* Am. Compl. ¶ 39. He hopes to cover his costs with scholarships and loans, and he considers the ABA LOSF program to be an attractive option in part because scholarship funds are unrestricted. *See* Am. Compl. ¶¶ 40–41, 46. Member B alleges in conclusory fashion that he "is ready and able to apply to the ABA's [LOSF] scholarship in the next [2026] cycle." Am. Compl. ¶ 43; *see* Am. Compl. ¶¶ 45–46.

**C. Relief Requested**

The amended complaint has one count, a claim under 42 U.S.C. § 1981. The Alliance requests the following relief: (1) a declaration that the ABA's Legal Opportunity Scholarship Program violates § 1981; (2) a temporary restraining order and preliminary injunction barring the ABA from closing the application window and selecting scholarship winners; (3) "[a] permanent injunction barring Defendant from knowing or in any way considering applicants' race or

ethnicity when administering the scholarship;" (4) other equitable relief if necessary to remedy the ABA's alleged discrimination; (5) reasonable costs, expenses, and attorneys' fees of this action; and (6) "nominal damages." Am. Compl. p. 24.

### D. The 2026 Scholarship Program

In October 2025, The Alliance notified the court that the ABA had altered the eligibility criteria listed on its website for the upcoming 2026 LOSF application cycle. Notice re Changes Def.'s Scholarships 1, Dkt. No. 32. According to The Alliance, language requiring an applicant to be a member of a historically underrepresented minority group has been eliminated. *See id.* at 1–2; *ABA Legal Opportunity Scholarship*, [https://perma.cc/HRB7-SCV7]. The ABA's website now allegedly states that applicants must "have demonstrated a strong commitment to advancing diversity, equity, and inclusion (DEI)." *ABA Legal Opportunity Scholarship*, [https://perma.cc/HRB7-SCV7]. Neither The Alliance nor the ABA has briefed how, if at all, these changes affect this lawsuit.

## II. Motion Standards

The ABA's motion to dismiss tests the sufficiency of the amended complaint—not the merits of the entire case or an affirmative defense. *See Richards v. Mitcheff*, 696 F.3d 635, 637–38 (7th Cir. 2012) (Rule 12(b)(6)). The ABA attacks subject-matter jurisdiction on the face of the amended complaint, arguing that it does not show that The Alliance has Article III standing to sue. *See Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015) (citing *Apex Digit., Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 443 (7th Cir. 2009)) (discussing facial and factual attacks on subject matter jurisdiction); Mem. Law Supp. Mot. to Dismiss 1, Dkt. No. 24-1. When testing a complaint's sufficiency, under either Rule 12(b)(1) or 12(b)(6), the court accepts the complaint's well-pleaded facts as true and draws reasonable inferences from those facts in the plaintiff's

favor, but conclusory allegations that merely recite the elements of a claim do not enjoy a presumption of truth. *See Bilek v. Fed. Ins. Co.*, 8 F.4th 581, 584 (7th Cir. 2021) (citing *Taha v. Int'l Bhd. of Teamsters, Loc. 781*, 947 F.3d 464, 469 (7th Cir. 2020)) (Rule 12(b)(6)); *Bultasa Buddhist Temple of Chi. v. Nielsen*, 878 F.3d 570, 573 (7th Cir. 2017) (citing *Ezekiel v. Michel*, 66 F.3d 894, 897 (7th Cir. 1995)) (Rule 12(b)(1)).

### III. Standing

Article III of the Constitution limits the judicial power of federal courts to resolving "cases" and "controversies." U.S. Const. art. III, § 2, cl. 1. For "a lawsuit to constitute a case within the meaning of Article III, the plaintiff must have standing to sue." *Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 110 (2025); *see also id.* at 110–11. Since Article III standing is required for a federal court to have subject matter jurisdiction, the ABA's standing challenge must be addressed before reaching merits issues. *See FDA v. All. For Hippocratic Med.*, 602 U.S. 367, 397 (2024).

"[T]he irreducible constitutional minimum of standing contains three elements: injury in fact, causation, and redressability." *Diamond Alt. Energy*, 606 U.S. at 111 (citation modified) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). A "plaintiff may demonstrate standing by clearly pleading allegations [in her complaint] that 'plausibly suggest' each element of standing when all reasonable inferences are drawn in the plaintiff's favor." *Spuhler v. State Collection Serv., Inc.*, 983 F.3d 282, 285 (7th Cir. 2020) (quoting *Silha*, 807 F.3d at 173–74; other citations omitted).

An organization like The Alliance may establish its Article III standing in two ways: (1) "claim that it suffered an injury in its own right," or (2) "assert 'standing solely as the representative of its members.'" *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023) (quoting *Warth v. Seldin*, 422 U.S. 490, 511 (1975)).

6

The Alliance has chosen the second path. It invokes the representational standing doctrine on behalf of Members A and B. Under this doctrine, "an association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). A complaint must include "factual allegations" supporting each of these requirements. *Parents Protecting Our Children, UA v. Eau Claire Area Sch. Dist.*, 95 F.4th 501, 506 (7th Cir. 2024), *cert. denied,* 145 S. Ct. 14 (2024) (citation omitted).

The standing inquiry therefore boils down to whether the amended complaint alleges sufficient facts to show that Member A or B would have individual standing. In this context, the concrete and particularized injury that confers standing consists of the prospective applicant's loss of the opportunity to "compete on an equal footing" for a scholarship. *Gratz v. Bollinger*, 539 U.S. 244, 261 (2002) (citing *NE Fla. Chapter of Assoc. Gen. Contractors of Am. v. Jacksonville*, 508 U.S. 656, 666 (1993)). The parties agree about the test for analyzing individual standing. To have standing, an individual must be "likely to apply" for an ABA Legal Opportunity Scholarship "in the reasonably foreseeable future," which means, at a minimum, that the applicant "is able and ready to apply." *Carney v. Adams*, 592 U.S. 53, 60 (2020) (citing *Gratz*, 539 U.S. at 262, and *NE Fla. Chapter*, 508 U.S. at 666).

Relying on *Carney*, the ABA argues, "Absent allegations that Member A or Member B took any concrete steps to express their interest in, or apply to, LOSF, the amended complaint contains little more than 'words of general intent' that fall short of establishing an 'intent [to apply] that is concrete.'" Mem. Supp. Mot. to Dismiss 8, Dkt. No. 24-1 (quoting *Carney*,

7

592 U.S. at 64). In *Carney*, a lawyer challenged, on federal constitutional grounds, Delaware's criteria for appointment to a judgeship, specifically, political party membership requirements. *See Carney*, 592 U.S. at 56–57. The case was decided at summary judgment, and the Supreme Court held, based on an extensive factual record, that the plaintiff had not carried his burden to show that he was ready, willing, and able to apply for a judgeship. *See id.* at 59–64.

The Supreme Court has made clear that a plaintiff's burden to establish standing increases at successive stages of litigation, making a plaintiff's burden lightest at the complaint stage. *See Lujan*, 504 U.S. at 561. *Carney* does not opine on the pleading standard that applies to The Alliance's amended complaint. *See* 592 U.S. at 58–62. On the contrary, the *Carney* opinion emphasizes that it is "a highly fact-specific case," decided based on the summary judgment "record evidence." *Id.* at 63–64; *see also id.* at 60–62 (listing six categories of evidence affecting the standing analysis). It would therefore be improper to measure the amended complaint's allegations against the evidentiary record in *Carney*. *See, e.g.*, *Dunnet Bay Const. Co. v. Borggren*, 799 F.3d 676, 698–99 (7th Cir. 2015) (discussing the different standards for showing standing at the pleadings stage and at summary judgment).

Although it is not about pleading standards, *Carney* provides guidance in resolving one of the ABA's arguments. The ABA contends that individual standing is lacking because neither Member A nor Member B attempted to apply for a 2025 scholarship. *See* Mem. Supp. Mot. to Dismiss 7–8. The *Carney* court reaffirmed case law holding that "a plaintiff need not translate his or her desire for a [benefit] into a formal application where that application would be merely a futile gesture." *Carney*, 592 U.S. at 66 (alterations and internal quotations omitted). The Alliance's amended complaint plausibly alleges that applying during the 2025 scholarship cycle would have been an exercise in futility for Member A because he was, according to

8

materials on the ABA's website, categorically ineligible. *See*, *e.g.*, Am. Compl. ¶¶ 32, 42. That suffices under *Carney*. *See Carney*, 592 U.S. at 66; *Do No Harm v. Nat'l Ass'n of Emergency Med. Technicians*, 2025 WL 973614, at *4 (S.D. Miss. Mar. 31, 2025).

The question remains whether the amended complaint adequately alleges that Members A and B stood or stand ready, willing, and able to apply such that they would have standing. According to the amended complaint, in April 2025 Member A spent approximately five hours gathering the materials he needed to apply. *See* Am. Compl. ¶ 34. He created an account on the application portal run by Kaleidoscope, compiled his financial information, drafted a personal statement, and gathered transcripts and letters of recommendation. *See* Am. Compl. ¶ 34(a)–(g). The ABA argues that many of these application materials are likely duplicative or derivative of documents Member A created or gathered to apply to law schools, but at the complaint stage, The Alliance receives the benefit of a favorable construction of the amended complaint's allegations. So construed, it is hard to imagine what else Member A could have done, short of submitting an application, to demonstrate his readiness, willingness, and ability to apply. *Cf. Gratz*, 539 U.S. at 262 (plaintiff challenging, on Equal Protection grounds, university's admission policies demonstrated that he was ready, willing, and able to apply as a transfer student).

Cases involving scholarship applications appear to be few and far between. The closest case is *Do No Harm*, which held that a non-minority white scholarship applicant's complaint adequately alleged standing by pleading that the plaintiff gathered required application materials and, with the exception of his minority status, met the scholarship's published eligibility criteria. *See* 2025 WL 973614, at *1–2, 4–5. Consistent with that decision, the amended complaint here adequately alleges that Member A was ready, willing, and able to apply for the 2025 scholarship.

The Alliance has not met its burden to show that Member B would have standing, however. The amended complaint states that Member B plans to apply to attend law school in Fall 2026 and that he will "apply broadly for scholarships." *See* Am. Compl. ¶¶ 38–40 (quotation in ¶ 40). Member B was not applying to law school in 2025, and therefore he could not apply for a scholarship. He had gathered no materials, nor had he taken any other specific steps to apply for the 2025 cycle when the amended complaint was filed. *See* Am. Compl. ¶¶ 38–44. This is insufficient to show that Member B has standing. Furthermore, changed circumstances appear to have overtaken Member B insofar as he brings a prospective challenge to the 2026 scholarship program, for the ABA has altered the eligibility criteria in a manner that appears (the court implies no findings on this) to eliminate Member B's ineligibility based on his race. *See* Notice re Changes Def.'s Scholarships 1–2, Dkt. No. 32; *ABA Legal Opportunity Scholarship*, [https://perma.cc/HRB7-SCV7].

Based on the foregoing analysis, the court concludes that the amended complaint adequately alleges that The Alliance has standing to represent Member A because he stood ready, willing, and able to apply for a scholarship in 2025. The amended complaint's allegations regarding Member B do not confer representational standing.

## IV. The Merits

Congress enacted the statute presently codified, as amended, at 42 U.S.C § 1981 as Section 1 of the Civil Rights Act of 1866, 14 Stat. 27. The pertinent clause at issue in this litigation provides, "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). By this legislation, Congress "established a rule of equal treatment for the newly freed slaves" and "guarantee[d] continuous equality between white and nonwhite citizens with respect to the rights in question." *Jam v. Int'l Fin. Corp.*, 586 U.S. 199,

208 (2019) (citing *Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 427–30 (1968)). In 1991, Congress clarified, through legislation, that the phrase "make and enforce contracts" encompasses "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C.§ 1981(b); *see generally Rivers v. Roadway Exp., Inc.*, 511 U.S. 298, 304–08 (1994) (discussing the history and effects of the 1991 amendment).

The Alliance claims that, according to the published eligibility criteria, white, non-minority prospective law students were categorically ineligible to apply for 2025 LOSF scholarships. *See* Am. Compl. ¶¶ 51–62. The ABA contends that LOSF scholarships are "discretionary gifts" giving rise to no contractual relationship, so 42 U.S.C § 1981 does not apply. Reply Supp. Mot. to Dismiss 11, Dkt. No. 30. Alternatively, the ABA invokes the protections of the First Amendment. The court analyzes whether a contractual relationship has been pleaded as well as the parties' First Amendment arguments below.

But first a few preliminaries. If proven, The Alliance's claim of a categorical refusal to contract because of someone's race "amounts to a classic violation of § 1981." *Runyon v. McCrary*, 427 U.S. 160, 172 (1976). Next, neither party disputes that 42 U.S.C. § 1981 affords a cause of action to non-minority, white persons. The Supreme Court so held in *McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. 273, 288–95 (1976). Third and last, a 42 U.S.C. § 1981 plaintiff must plead and prove that "race was a but-for cause of his injury." *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 333 (2020). No causation question has been raised.

**A. Contractual Relationship**

A 42 U.S.C. § 1981 plaintiff "must initially identify an impaired 'contractual

11

relationship,' under which the plaintiff has rights. Such a contractual relationship need not already exist, because § 1981 protects the would-be contractor along with those who already have made contracts." *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006) (citation modified). The contractual right, actual or prospective, must be the plaintiff's, as contrasted with a legally separate person, like a corporation, even a closely held one. *See id.* at 476–77. The Supreme Court announced and applied this rule in *Domino's Pizza*, holding that an African-American plaintiff who owned a company that in turn had a franchise agreement with the defendant could not sue the franchisor under 42 U.S.C. § 1981 for allegedly cancelling a franchise agreement because of plaintiff's race. *Id.* at 476–80. While a contractual right was allegedly impaired, it belonged to the franchisee company rather than the plaintiff individually, and, as the Court explained, "[I]t is fundamental corporation and agency law—indeed, it can be said to be the whole purpose of corporation and agency law—that the shareholder and contracting officer of a corporation has no rights and is exposed to no liability under the corporation's contracts." *Id.* at 477. With this rule in view, the court turns to The Alliance's amended complaint.

The Alliance identifies four actual or potential contractual relationships: "[1] Kaleidoscope's privacy policy, [2] Kaleidoscope's terms of service, [3] the ABA's privacy policy, and [4] the ABA's release." Resp. Opp'n Mot. to Dismiss 10, Dkt. No. 29; *see also* Am. Compl. ¶¶ 15–17, 55. As to the first two relationships, in preparing to apply, Member A created an account on the Kaleidoscope platform. Am. Compl. ¶ 34(a). No barriers to Member A's formation of a contract with Kaleidoscope have been alleged. *See* Am. Compl. ¶ 34. Therefore, no claim has been stated against Kaleidoscope.

Regarding its privacy policy and the release form scholarship applicants had to sign, the

12

ABA argues that the LOSF scholarship is offered on a "gratuitous" basis. It downplays the value of the scholarship applicants' agreement to permit the ABA to use a winner's application materials. "It strains credulity," the argument continues, "to suggest that the ABA awards $15,000 to students in exchange for the right to publish their names or to increase the ABA's number of free student members." Mem. Supp. Mot. to Dismiss 11–12, Dkt. No. 24-1.

"The elements of a valid and enforceable contract are offer, acceptance, and consideration." *Kap Holdings, LLC v. Mar-Cone Appliance Parts Co.*, 55 F.4th 517, 522 (7th Cir. 2022) (internal quotations omitted). Under fundamental principles of contract law, unless fraud or mistake is alleged, courts ordinarily "do not even permit inquiry into the adequacy of the consideration for a promise or a transfer." *Scholes v. Lehmann*, 56 F.3d 750, 756 (7th Cir. 1995) (citations omitted). Applied here, this principle means that this court cannot accept the ABA's invitation to compare the amount of money the ABA awards LOSF winners to the value of the consideration the ABA received in return.

In addition, to accept the ABA's characterizations of the nature of the LOSF scholarship program, the court would have to disregard certain allegations of the amended complaint. As explained above, at this stage of the case the court must accept the amended complaint's well-pleaded factual allegations as true, regardless of whether they are, or are not (nothing is implied about this here), doubtful or "unlikely" to be borne out as factually accurate once discovery has been taken. *See*, *e.g.*, *Iqbal*, *supra*, 556 U.S. at 678–79. So for present purposes, the following allegations are presumed to be true:

> 15. Applicants to the ABA's scholarship "must submit" a "Personal Statement," an "Official or unofficial transcript," "2–4 Letters of Recommendation," and a "Signed Release Form." Legal Opportunity Scholarship Fund Material Requirements, ABA (Mar. 15, 2023), archive.is/HPxNN (2025 Material Requirements).

13

    (a)    The personal statement is an essay of no more than 1,000 words. The ABA does not limit what applicants can discuss, but one encouraged topic is the applicant's "personal and family history of educational or socio-economic disadvantage." 2025 FAQs. Especially given the minimal and impersonal nature of the scholarship's other requirements, the personal statement plays an outsized role in determining who wins. *See*, *e.g.*, ABA Legal Opportunity Scholarship Recipient Stories 2022, ABA Section of Taxation, YouTube (Oct. 11, 2022), youtube.com/ watch?v=I929eergRPk (explaining that applicant was selected due to "story" in her personal statement).

    (b)    The letters of recommendation can be uploaded by the applicant, or separately by the recommenders. On the FAQs page, the ABA confirms that applicants can simply reuse "the letters from [their] law school applications." 2025 FAQs. The ABA does not limit who can be a recommender.

    (c)    The release form is a contract between the applicant and the ABA. It states, "As consideration for such grant and for the opportunity to participate in the American Bar Association Legal Opportunity Scholarship Program," the applicant must "grant the ABA the right to use in all media, your name and voice, and, if selected, your photograph, biography and excerpts from your scholarship application" in its own materials. Legal Opportunity Scholarship 2025, Kaleidoscope (2025 Application). Applicants must sign and date the release form, endorsing the statement: "I hereby consent to the use of information about myself and my application, as stated and described herein, and agree with the provisions of this release form." 2025 Application. The applicant also agrees that the ABA "will automatically enroll you as a free ABA law student member." 2025 Application.

16. This "consideration" is valuable to the ABA. 2025 Application. The ABA uses applicants' information to recruit new and additional sources of funding for itself. And when applicants become members, they agree to the ABA's constitution, bylaws, and privacy policy. Those contracts, among other things, let the ABA sell members' data to third parties. Privacy Policy, ABA (eff. Apr. 15, 2025). And the ABA uses members' information, including law students with free accounts, to generate advertising revenue for itself and to sell them its products and services—like premium memberships, practice groups, CLEs, and other materials, events, and more. Growing the size of the ABA's membership also increases its audience and its effectiveness when lobbying and litigating.

17. On the application's "Confirmation" page, applicants must sign and date a pledge. That pledge has applicants agree not to provide "false, misleading or incomplete information" regarding the scholarship and to "provide proof"

14

>of anything they said on the application, "including a copy of me and my parents' U.S. income tax returns." 2025 Application.

Am. Compl. ¶¶ 15–17; *see also* Am. Compl. ¶ 55.

In the case on which the ABA principally relies, the court held that an unpaid intern failed to allege a bargained-for exchange of valuable consideration with her erstwhile employer. *See Adam v. Obama for Am.*, 210 F. Supp. 3d 979, 986 (N.D. Ill. 2016). The Alliance pleads significantly more than the one-sided agreement in *Adam*, however. According to the amended complaint, by applying, applicants agreed to allow the ABA to use their written application materials for promotional purposes, if selected. *See* Am. Compl. ¶¶ 15–16. Although the written release form is not in the record, the amended complaint plausibly describes the essential ingredients of a non-exclusive license granted to the ABA to use copyrighted materials, that is, the applicant's essay and other written submissions. *See generally I.A.E., Inc. v. Shaver*, 74 F.3d 768, 777 (7th Cir. 1996) (discussing the elements of a non-exclusive copyright license); *see also* 17 U.S.C. § 106. The promise to grant a non-exclusive license of a copyrighted work has been held to be good and valuable consideration sufficient to support formation of a contract. *See Shaver*, 74 F.3d at 778; *Beasley v. John Wiley & Sons, Inc.*, 56 F. Supp. 3d 937, 943 (N.D. Ill. 2014). Thus, the amended complaint plausibly pleads a bargained-for exchange of legally sufficient consideration—an applicant's promise to grant a license to use copyrighted application materials in exchange for a chance to participate in the scholarship contest. Since this is sufficient consideration, it follows that the amended complaint plausibly pleads impairment of a potential contractual relationship under 42 U.S.C. § 1981.

The parties cite no 42 U.S.C. § 1981 cases concerning private scholarship programs.[1] In

---

[1] The parties debate the correctness and applicability of the Eleventh Circuit's non-binding decision in *American Alliance for Equal Rights v. Fearless Fund Mgmt., LLC*, 103 F.4th 765 (11th Cir. 2024), a case concerning a private small business grant program open to African-American entrepreneurs. The ABA expressly asks this court to hold

15

*Do No Harm*, *supra*, the plaintiff, a national membership organization with goals similar to The Alliance's, but in the medical field, brought a § 1981 claim against an organization for excluding non-minority applicants from eligibility to apply for scholarships intended to help students interested in pursuing careers in emergency medical services. *See* 2025 WL 973614, at *1–2. The district court held that the complaint stated a 42 U.S.C. § 1981 claim, concluding that the plaintiff plausibly pleaded that "she was denied the opportunity to compete on equal footing with applicants of color because of her race." *Id.* at *6. The amended complaint here similarly states a plausible claim under 42 U.S.C. § 1981.

**B. First Amendment**

Relying on cases such as *303 Creative LLC v. Elenis*, 600 U.S. 570 (2023), the ABA argues that it "has a First Amendment right to distribute funds as it deems appropriate, consistent with its organizational goals." Mem. Supp. Mot. to Dismiss 13; *see id.* at 11–16. The Alliance offers a two-pronged response. *See* Resp. Opp'n Mot. to Dismiss 14–20, Dkt. No. 29. The first prong is procedural. It argues that the First Amendment question should not be resolved at this early procedural juncture. *Id.* at 14–18. Second, The Alliance draws on the distinction in First Amendment law between statutes primarily regulating conduct, which receive intermediate scrutiny, and content-based regulations subject to strict scrutiny. *See id.* at 18–20; *see generally Richwine v. Matuszak*, 148 F.4th 942, 953–55 (7th Cir. 2025). The court begins and ends with The Alliance's procedural objection, which is well-taken.

By invoking the First Amendment, the ABA has raised an affirmative defense to The Alliance's 42 U.S.C. § 1981 claim. *See, e.g.*, *Siegel v. Zoominfo Techs., LLC*, 2021 WL 4306148,

---

that *Fearless Fund* was wrongly decided. Reply Supp. Mot. to Dismiss 12, Dkt. No. 30. This court implies nothing about *Fearless Fund* because it is unnecessary to do so in order to resolve the ABA's motion to dismiss the amended complaint.

16

at *3–4 (N.D. Ill. Sept. 22, 2021); *World Kitchen, LLC v. Am. Ceramic Soc'y*, 2015 WL 3429380, at *2 (N.D. Ill. May 27, 2015). The "affirmative defense" label allocates the burdens of pleading and proof; a defendant bears the burden to plead and prove any affirmative defenses it chooses to raise. *See* Fed. R. Civ. P. 8(c)(1); *Perry v. Merit Sys. Prot. Bd.*, 582 U.S. 420, 435 n.9 (2017). This means that "[a] plaintiff 'need not anticipate or refute potential affirmative defenses'" in a complaint. *Kass v. PayPal Inc.*, 75 F.4th 693, 699 (7th Cir. 2023) (quoting *Luna-Vanegas v. Signet Builders, Inc.*, 46 F.4th 636, 640 (7th Cir. 2022); other citations omitted); *accord Perry*, 582 U.S. at 435 n.9. For this reason, dismissal at the Rule 12(b)(6) stage based on an affirmative defense is generally inappropriate unless "the factual allegations in the complaint unambiguously establish all the elements of the defense." *G.G. v. Salesforce.com, Inc.*, 76 F.4th 544, 566 (7th Cir. 2023) (quoting *Hyson USA, Inc. v. Hyson 2U, Ltd.*, 821 F.3d 935, 939 (7th Cir. 2016)).

     The general rule against deciding an affirmative defense at the Rule 12(b)(6) stage applies with full force to a First Amendment defense, which sometimes, perhaps often, turns on disputed facts, facts outside the complaint, or both. *See, e.g.*, *Siegel*, 2021 WL 4306148, at *4; *Dobrowolski v. Intelius, Inc.*, 2017 WL 3720170, at *8–9 (N.D. Ill. Aug. 29, 2017). The ABA argues that the amended complaint provides everything the court needs to sustain its First Amendment defense. *See* Reply Supp. Mot. to Dismiss 12–14. But in making this argument, the ABA's characterization of the complaint runs afoul of the principle that reasonable inferences must be drawn in the plaintiff's favor at the Rule 12(b)(6) stage. The ABA quotes selectively from its website and from the amended complaint to establish the first pillar of its First Amendment argument, namely that the LOSF scholarship program evinces its "subjective intent to communicate a message, and that the ABA's conduct objectively communicates that

17

message." *Id.* at 13; *see id.* at 13–14. To be sure, there is support in the amended complaint for the ABA's assertion that it seeks to promote diversity in the legal profession by awarding LOSF scholarships. *See, e.g.*, Am. Compl. ¶ 21. However, for present purposes, the court must also give credence to the amended complaint's non-conclusory allegations that, for example, the ABA has taken the position in friend-of-the-Court briefs that declining to contract on the basis of a protected characteristic is not expressive conduct within the meaning of the First Amendment. *See* Am. Compl. ¶ 23(a). And the amended complaint's allegations that "The ABA has repeatedly denied—at least when threatened with legal action—that the explicit use of race is part of its DEI goals" also receives the benefit of favorable inferences. Am. Compl. ¶ 23(c).

Taken together, the amended complaint's well-pleaded factual allegations raise disputed factual questions that the parties consider relevant, even central, to the First Amendment inquiry. Since important facts are disputed, the amended complaint and the materials cited in the present round of briefing do not furnish everything the court needs to rule on the ABA's First Amendment defense. Further factual development is needed.

**C. Sending Rule 5.1 Notice of a Constitutional Question**

The court addresses the parties' dispute over the applicability of Federal Rule of Civil Procedure 5.1 in order to chart the path forward in this litigation. As pertinent here, Rule 5.1 provides, in a case in which the United States or one of its agencies or officers is not a party: "A party that files a pleading, written motion, or other paper drawing into question the constitutionality of a federal or state statute must promptly file a notice of constitutional question stating the question and identifying the paper that raises it." Fed. R. Civ. P. 5.1(a)(1) (citation modified). The notice must be served on the United States Attorney General if a federal statute is called into

question, and the court must certify the question under 28 U.S.C. § 2403; Fed. R. Civ. P. 5.1(a)–(b). The Attorney General then has sixty days in which to intervene. *See* Fed. R. Civ. P. 5.1(c).

The Alliance maintains that the ABA has called the constitutionality of 42 U.S.C. § 1981 into question by invoking the First Amendment. The ABA responds, correctly in the court's view, that it has raised an as-applied challenge, meaning that it does not attack the constitutionality of the statute on its face and instead argues only that the statute is at odds with the First Amendment as applied to the ABA on the facts of this case. *See generally Six Star Holdings, LLC v. City of Milwaukee*, 821 F.3d 795, 803–04 (7th Cir. 2016) (differentiating between facial and as-applied constitutional challenges); *see also* Reply Supp. Mot. to Dismiss 11. The Seventh Circuit does not appear to have issued an opinion squarely resolving whether Rule 5.1 requires notice of an as-applied challenge, though a footnote in *Kathrein v. City of Evanston*, 752 F.3d 680, 684 n.1 (7th Cir. 2014), chastises the plaintiffs for not sending a Rule 5.1 notice when they amended their complaint to challenge the constitutionality of a federal tax statute as it was applied to them.

This court is mindful of the potential to inundate federal and state officials with Rule 5.1 notices each time someone raises a constitutional defense. Even so, consistent with the *Kathrein* footnote, district courts in the Seventh Circuit have consistently required a Rule 5.1 notice where the defendant raises a First Amendment defense amounting to an as-applied challenge to a state or federal statute. *See*, *e.g.*, *Falkner v. City of Chicago*, 150 F. Supp. 3d 973, 979 (N.D. Ill. 2015) (collecting citations); *Gabiola v. Mugshots.com, LLC*, 2016 WL 11719255, at *1–2 (N.D. Ill. Dec. 19, 2016); *Senne v. Vill. of Palatine*, 2013 WL 68703, at *5 (N.D. Ill. Jan. 4, 2013). Since the First Amendment issue requires further factual development, giving notice un-

der Rule 5.1 is unlikely to hinder the progress of this case in the next sixty days. Rule 5.1 compliance will be required.

## V. Conclusion

For the reasons stated, the ABA's motion to dismiss the amended complaint, Dkt. No. 24, is granted in part and denied in part. The amended complaint is dismissed for lack of Article III standing insofar as The Alliance's standing derives from Member B. The motion to dismiss the amended complaint's 42 U.S.C. § 1981 claim for failure to state a claim is denied. The court does not reach the ABA's First Amendment affirmative defense and implies no view on it or any related issues. If plaintiff wishes to amend, it must file a second amended complaint within 14 days, by and including February 4, 2026. If no second amended complaint is filed, defendant's answer is due on or before February 18, 2026.

The parties are instructed to file a joint status report within fourteen days, by and including February 4, 2026, proposing a plan for giving notice in compliance with Federal Rule of Civil Procedure 5.1.

Date: January 21, 2026                                              /s/ Joan B. Gottschall
                                                                    United States District Judge